**Ray L. CHAPPELLE, Appellant,**

v.

**Jim WOODWARD, Appellee.**

No. 14063.

Court of Civil Appeals of Texas.

Houston.

May 30, 1963.

Hicks, Dollahon & Wohlt, F. Warren Hicks, Houston, for appellant.

Eastup & Kroll, Gordon J. Kroll, Houston, for appellee.

WERLEIN, Justice.

This suit was brought by appellee, Jim Woodward, against appellant and his wife, Martha Chappelle, to recover damages for personal injuries resulting from a collision which occurred about 11 o'clock a. m. on October 16, 1959, between an automobile driven by Mrs. Chappelle and an automobile driven by appellee in the City of Houston at the intersection of Sandpiper

and Sharpview Streets, an open intersection with no traffic control of any kind.

Appellant does not complain of the jury findings of negligence on the part of Mrs. Chappelle proximately causing the collision, but does complain of the jury findings exonerating appellee of contributory negligence. The jury found that appellee, who was driving in a westerly direction on Sharpview, did not fail to keep a proper lookout as he approached the intersection for vehicles approaching such intersection from the north on Sandpiper; that he was not driving at a negligent rate of speed; and that he was not negligent in failing to make such application of his brakes as would have been made by a person of ordinary prudence in the exercise of ordinary care. In his first 9 Points appellant asserts that there is no evidence and also insufficient evidence to support such findings and that the same are so against the great weight and preponderance of the evidence as to be manifestly wrong.

The evidence shows that when appellee was about 30 feet from the intersection of said streets he looked to his right and saw Mrs. Chappelle's automobile approaching the intersection from the north on Sandpiper. He variously estimated her distance from the intersection at such time as being "75 feet, not less. It could have been more than 60 feet." He further testified that she was twice as far or more from the intersection as he was; that she could have been more than 60 to 75 feet back; and that she was half a block away, a great distance back. The investigating police officer testified that appellee told him Mrs. Chappelle was about a quarter or a half a block back when he first saw her. Appellant testified that he had been driving 20 miles per hour but he applied his brakes and slowed down to about 15 miles per hour as he entered the intersection because there were children who played in the streets. There is no evidence that he was driving in excess of 20 miles per hour. The speed limit was 30 miles per hour.

Mrs. Chappelle testified that she thought she was driving 35 miles per hour; that she didn't see appellee until he was in the intersection directly in front of her, and at that time she was not in the intersection but about two seconds away from it; that she was six months pregnant at the time and sort of had her head in the clouds and was oblivious to what was going on around her; that from the time she had left her home some seven miles away, she had been driving in a dazed and oblivious condition; that she was sorry but just didn't see appellee; that she had paid a fine for negligent collision; and that she didn't apply her brakes at all and was traveling 35 miles per hour when she struck appellee's car.

The evidence shows that there were no obstructions which kept appellee from seeing Mrs. Chappelle's car as he said he did, or that would have kept her from seeing his car. The collision occurred approximately in the center of the northwest quadrant of the intersection, about 4 feet from the north curb line and 7 feet from the west curb line. This indicates that appellee was more than half way across the intersection before his car was struck broadside. It was a clear, dry day. Both streets were paved and were approximately 26 feet in width.

Appellee testified that as he approached the intersection, he looked to his right and saw Mrs. Chappelle's car at such distance that the only impression he formed was that he had a clear intersection. He then looked or "cleared" his left side, and then glanced back and Mrs. Chappelle was right at his door and rammed into him. There is nothing to show that he was not keeping a proper lookout or that he was driving at an improper rate of speed.

There is some confusion in appellee's testimony with respect to whether he realized the speed at which Mrs. Chappelle was driving when he looked to the right and first saw her car. On his deposition he testified that Mrs. Chappelle's car was

moving but that he did not form any estimate as to the speed of the car; that he was going 15 miles per hour and he supposed she was going much faster than that. He was then asked:

"Q. You didn't form any impression that she was?

"A. No. The only impression that I formed was that I knew that I had a clear intersection. She was going at a tremendous speed."

He was then asked:

"Q. You did only have that split second impression of her before the inpact?

"A. Yes. I remember flashing through my mind a terrific speed she must have been making."

At the trial appellee testified on cross-examination, to questions by appellant's counsel:

"Q. All right, you said when you saw Mrs. Chappelle here (indicating) she was coming at a terrific speed, wasn't she?

"A. Looked that way.

"Q. You realized that she was coming at a terrific speed?

"A. Looked that way.

"Q. How fast do you estimate she was traveling?

"A. Oh, in excess of 35 to 40 miles per hour.

"Q. That's what you mean by a terrific rate of speed?

"A. Yes, sir.

"Q. You estimate she was going how fast—35 to 40?

"A. 35 to 40."

On cross-examination he also testified as follows:

"Q. That's the two times you saw her car?

"A. Yes, sir.

"Q. One thing that flashed through your mind when you saw her back up there half a block away she was traveling at a terrific speed?

"A. I thought so.

"Q. That's what flashed through your mind?

"A. Yes, sir—I beg your pardon— what do you mean by when I saw her way back up there at a terrific speed—I didn't understand you there. If I might add, when I saw Mrs. Chappelle's car back up there when I cleared to the right I knew and felt that I had the right—after clearing to the left—to cross that intersection or I could have waited for whatever she did, if I had come to a stop.

*　　*　　*　　*　　*　　*

"Q. You did have only that split second impression of her before the impact?

"A. Yes. I remember flashing through my mind a terrific speed she must have been making.

"Q. That is the impression you got just as you entered that intersection?

"A. Just as she hit me.

"Q. You didn't get the impression of the terrific speed she was making before that time?

"A. No, sir.

"Q. When did you get the impression of the terrific speed?

"A. When she hit me."

While the testimony of appellee seems somewhat conflicting and confusing as to when he arrived at his conclusion that Mrs. Chappelle must have been going at a terrific speed, we think his entire testimony given on his deposition and at the trial on cross-examination shows that it first flashed across his mind in the split second before the impact that she must have been going at a terrific speed. In any event, there is ample evidence from which the jury could have so found in answering the contributory negligence issues.

■ We have carefully read the statement of facts, and have concluded that we cannot say that the findings of the jury with respect to either lookout, speed, or application of brakes on the part of appellee are so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. There is ample evidence to support the jury findings to each of such issues. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660; Tudor v. Tudor, 1958, 158 Tex. 559, 314 S. W.2d 793.

■ In his next Points, appellant asserts that there is no evidence, also insufficient evidence to support the jury's finding of damages sustained by appellee as the result of his injuries, and that the jury's finding is so against the great weight and preponderance of the evidence as to be manifestly wrong. We do not agree.

The jury awarded appellee $9,000.00 for his personal injuries and $1,037.50 for reasonable medical bills incurred as a direct and proximate result of the injuries. We think it unnecessary to recite at length the medical testimony in regard to appellee's injuries. It will suffice to say that Dr. Behr testified that appellee received four fractured ribs, a brain concussion, and an acute flexion-extension injury to the cervical and dorsal spine in addition to numerous contusions, abrasions and lacerations. X-rays taken on different occasions revealed the loss of space between the fifth and sixth cervical vertebrae and an increase in the loss of space indicating degeneration of the intervertebral disk. The doctor testified that in reasonable medical probability such condition was caused by the collision, and that appellee would have further symptoms and pain attributable to such condition. He also testified that appellee was still suffering from the results of his injuries at the time of the trial, and that he would continue to suffer pain in the future and would need future medical treatment, and though he had made a remarkable recovery he would have some permanent disability as a result of the collision.

Appellee testified that he was rendered unconscious by the collision; that his dentures were broken into pieces, cutting the inside of his mouth; that he was taken by ambulance to Hermann Hospital where he was confined from Friday until Sunday; that a place in his back was sewn up at the hospital; that he was confined to bed at home for a week to ten days following his release from the hospital; that in addition to physical therapy, traction was applied to his head and neck for two or three hours a day for about a year or so; that he had worn a neck collar for about two years off and on and still occasionally used it; and that the injury still bothered him and slowed him down. He further testified that for the three years before the collision he averaged $7,000.00 to $8,-000.00 per year and that in the first year after the accident he earned only $6,500.00, and in the second year only $4,300.00

It is true that Dr. Behr testified that the physical examination made by him disclosed that appellee had an arthritic condition in the spine and a pre-existing condition which he described as Marie Struempell's Disease. Appellee testified that he had never had any treatment for any prior sickness or disease other than routine things like virus, and had had no prior injury except a broken arm when he fell while on ice skates.

Upon a careful consideration of all the evidence, we have concluded that the finding of the jury as to damages sustained by appellee and the amount thereof is supported by sufficient evidence of probative force and is not so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. In re King's Estate, supra; Mikell v. La Beth, Tex.Civ.App., 344 S.W.2d 702, ref., n. r. e., and authorities cited therein.

Judgment affirmed.